BARRY, Judge,
dissenting.
Apparently the majority affirms based on Scott’s asbestos exposure, yet the opinion says that “not one physician could state that plaintiff developed asbestosis caused by his exposure to fibrogenic dust at Ryan-Walsh.” The majority missed the point. Scott did not limit his claim to this substance nor the clinical disease “asbestosis”; rather, it was alleged and clearly proved that he was exposed to a variety of fibro-genic dusts which the trial judge correctly found aggravated his diseased lungs.
Willie Scott, 56 years old with a second grade education, has a 20 year work history of exposure to dust from asbestos, carbon black, building gunite, grain and other fibrous substances. He joined the freight handler’s union in 1958 and was employed by Ryan-Walsh from January, 1974 until December 24, 1979 when he retired. During his working life Scott loaded and unloaded box cars containing bags of the above substances, some of which were broken and caused an extremely dusty environment.
Scott smoked one and a half to two packs of cigarettes a day from age 15 until 1979, and was smoking “a little” (four cigarettes a day) in April, 1982. For some reason the majority points out that Scott “had habitually drunk a half-pint of whiskey a day”. There is no evidence that whiskey caused or contributed to his lung disease.
*1263 In December, 1979 Dr. George Pettit hospitalized Scott for extensive tests which revealed his primary ailments were a chronic lung problem, hypertension, and arthritis. He opined Scott was disabled and unable to do strenuous physical activity.
During Scott’s hospitalization Dr. Pettit consulted Dr. Eugene Rosenberg, a pulmonary specialist, who detected an abnormal lung condition which is common in heavy smokers and not generally found in chronic interstitial diseases. He said the x-rays appeared normal but “one could read in a little bit of increase in interstitial markings ... which could reflect some type of dust inhalation.” Dr. Rosenberg felt the obstructive changes were not caused by the work environment and Scott’s “mild” impairment was not disabling. Importantly, Dr. Rosenberg said the dust condition where Scott worked “was an aggravating factor.”
On July 17, 1981 Dr. Morton Brown, pulmonary specialist, found Scott had interstitial fibrosis of the lung due to fibrogenic dust. Dr. Brown saw Scott regularly up to the trial and said the x-rays revealed increased interstitial markings and the breathing tests showed evidence of moderate obstruction of the small airways which is one of the first signs of interstitial fibrosis. While the literature classically characterizes fibrogenic dust disease as restrictive, Dr. Brown stated he had seen instances in non-smokers where the changes were obstructive. It was his opinion that in some cases (as here) small airway obstruction is characteristic of interstitial fibrosis, but he acknowledged it might be due to prolonged cigarette smoking. He disagreed that Scott’s pulmonary function studies ruled out restrictive disease; however, he concurred that the function studies indicated the lung disease was moderately obstructive. Regarding the latency period, Dr. Brown said it was possible the disease was too advanced to have begun since 1974 when he started working for Ryan-Walsh. The doctor noted that it generally takes 10 years for scarring to develop, but it is difficult to pinpoint a term because people react differently. Significantly, he said Scott’s years at Ryan-Walsh had an additive effect on his lung disorder.
Dr. Bernard Brach, pulmonary specialist, saw Scott once on September 21, 1982 and he agreed with Dr. Brown. Dr. Brach testified the x-rays revealed pleural thickening which is generally associated with fibrosis. He also stated the x-rays indicated an increase in linear and non-linear markings in the mid to lower lung zones, the area usually affected in occupational diseases. When asked whether the markings are the type expected in a person who smoked for 30 years, he stated “no” because he had seen many patients who smoked that much without the markings. He added: “I have never seen pleural changes associated with smoking.” Dr. Brach stated the exercise test clearly showed the reason for Scott’s shortness of breath was not his heart (the cardiac response was normal) but his lung problems. He unequivocally stated Scott’s problems were from exposure to fibrogenic dust — not from smoking. Dr. Brach agreed with Dr. Brown that while fibrogenic diseases are generally considered restrictive, he had seen asbestosis patients with mild obstruction. Regarding the latency period, he stated while time is generally known for a single agent (asbestos), the effect of a combination of multiple dust exposures is not known. Dr. Brach opined that Scott could handle only light work, but not where he would be exposed to dust.
Dr. Hans Weill, defendant’s pulmonary specialist, examined plaintiff on July 26, 1982 and found sounds suggestive of bronchitis, but no pleural thickening or interstitial changes. Dr. Weill opined there was no lung disease, but stated he could not comment on the pleural surfaces or rule out restrictive disease which had no clinical significance. Regarding the latency period, Dr. Weill stated asbestos took 20 years to appear, but he was not asked about the effect of any other agent or a combination of dusts.
While the majority opinion correctly points out occupational diseases are generally restrictive, it overlooks the fact that *1264 all the pulmonary experts agreed that an occupational disease could contribute to lung obstruction, i.e., be obstructive. Three of the four specialists noted evidence of at least mild obstructive disease. Only defendant’s Dr. Weill found no evidence of lung impairment. Dr. Rosenberg attributed the obstruction to smoking but felt dust exposure contributed to Scott’s problems. Dr. Brown and Dr. Brach said Scott’s condition was the result of occupational dust exposure.
The trial judge found Scott “suffered injury or, at least, aggravation of a pre-ex-isting condition due to dust inhalation. Although plaintiff’s breathing problems are largely attributable to cigarette smoking ... the Court finds a relationship between the plaintiff’s respiratory problems and his exposure to dust inhalation....”
There is certainly sufficient medical evidence to conclude that Scott’s lung condition was causally connected to his employment with Ryan-Walsh. Even if the obstruction pre-dates that employment, the record supports the trial judge’s finding that the condition was aggravated by his employment and is compensable. Lofton v. Louisiana Pacific Corporation, 410 So.2d 1171 (La.App. 3d Cir.) writ denied 412 So.2d 1094 (La.1982). Compensation is due “even though the disease or condition might have brought about the disability in any event in its ordinary course_” Altor v. Belden Corporation, 393 So.2d 1233 (La.1981). It is immaterial that the disability could have been brought on by causes other than work-related exposure if the occupational exposure is in fact a disabling factor.
The trial judge awarded the minimum benefit (100 weeks) based on impairment of a physical function under R.S. 23:1221(4)(p). This provision applies where the impairment is “less than disabling ... is more than a mere triviality and yet does not rise to the dignity of a disability.” Joseph v. Martin Mills, Inc., 394 So.2d 722 (La.App. 3d Cir.1981); Malone and Johnson, La. Civil Law Treatise, Workers’ Compensation, Vol. 13, Section 286 at 666 (1980).
None of the doctors said Scott was totally disabled. However, the evidence does establish that he could not perform strenuous physical labor and will never be able to work in an environment of fibrous dusts.
Dr. Brown testified Scott’s disease would be progressive even outside of a dusty environment and his prognosis guarded since the lungs were damaged. Dr. Brach and Dr. Pettit said Scott could not do moderate or heavy labor — only light clerical type work. There is no evidence that he is so disabled as to make him a marginal employee to be classified as an “odd lot.” Unquestionably, he is capable of holding some “gainful occupation.”
Under LSA-R.S. 23:1221(3) as amended, an employee who is unable “to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience ...” is classified as partially disabled.
A preponderance of the medical evidence shows that Scott cannot resume manual labor, or return to work where he would be exposed to fibrous dust, and his condition will deteriorate. His impairment is obviously permanent and he is partially disabled under LSA-R.S. 23:1221(3).
Dr. Brown diagnosed Scott’s condition on July 17, 1981 and legal interest should be paid on each benefit payment from that date. Shatoska v. International Grain Transfer, Inc., 430 So.2d 1255 (La.App. 1st Cir.1983). Scott is entitled to the stipulated medicals: West Jefferson Hospital— $2,222.02; Dr. Brown — $619.00; Avenue C Clinic — $179.00; and East Jefferson Hospital — $290.00.
I therefore respectfully dissent.